UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| ERIKA POMERANTZ, | ) | Civil Action No. 4:22-cv-1437-JD-TER |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| COASTAL CAROLINA UNIVERSITY, | ) | |
| PETER PAQUETTE, and ANGEL | ) | |
| ONLEY-LIVINGSTON, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## I.    INTRODUCTION

This action arises from Plaintiff's employment with Defendant Coastal Carolina University (the University).  Four causes of action remain: (1) race discrimination in violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000(e) et seq. and 42 U.S.C. § 1981 against the University; (2) retaliation in violation of Title VII and § 1981 against the University; (3) hostile work environment in violation of Title VII and § 1981 against the University; and (4) slander against Defendant Angel Onley-Livingston.[1] Presently before the court is Defendants' Motion for Summary Judgment (ECF No. 47).  All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. 636(b)(1)(A) and (B) and Local Rule 73.02 (B)(2)(e), DSC.  This report and recommendation is entered for review by the District Judge.

## II.    FACTS

Plaintiff is a graduate of Coastal Carolina University.  She was employed by the University

---

[1]The court previously dismissed a negligent supervision claim against the University and a slander claim against Defendant Peter Paquette. See Order (ECF No. 13).  Because the only claim asserted against Paquette was the slander claim, he has been dismissed from this action.

as a math tutor while she was a student. Pl. Dep. 8-10 (ECF No. 47-19). Following her graduation, she worked at the University as an Admissions Counselor and later in the Alumni Relations Office. Pl. Dep. 13-14. While working full time for the University, Plaintiff earned her Master's Degree in professional counseling. Pl. Dep. 15. Upon receiving her Master's Degree, Plaintiff worked for a private sector counseling office for approximately two years before returning to the University as a clinical counselor. Pl. Dep. 21-24. Plaintiff worked a ten-and-a-half-month schedule with six weeks off during the summer. Pl. Dep. 21. She also saw clients on evenings, weekends, and during the summer outside of her position with the University. Pl. Dep. 23, 27-29.

Plaintiff represents that she is of Jamaican, Chinese, and Spanish descent, and that her mother is a first-generation immigrant to the United States, having earned her citizenship in 1997. Plaintiff's father is Jewish and she celebrates Jewish holidays with him, but she is confirmed in the Catholic faith. Pl. Dep. 150.

The Counseling Services department at the University provided counseling to students, including fifteen-minute consultations and thirty to forty-five minute therapy sessions. Onley-Livingston Dep. 21 (ECF No. 62-11). Counseling Services had seven counselors when fully staffed and each counselor saw approximately five to seven students each day. Onley-Livingston Dep. 21.

At the time of the Plaintiff's hiring, the Senior Director of Counseling Services was Jennie Cassidy. Plaintiff testified that in the Fall of 2018, Dr. Cassidy promised her a promotion by adding a public relations component to her responsibilities. According to Plaintiff, Dr. Cassidy indicated that she would have to convince her supervisor, Dr. Debbie Conner, the Vice-President of the Department, to create and budget for the position. Pl. Dep. 42-44. Plaintiff testified that Dr. Cassidy adjusted her title to Clinical Counselor and Outreach Coordinator but informed her that it would not be until the

Fall of 2019 before her salary would be adjusted. Pl. Dep. 43. Dr. Cassidy also gave Plaintiff her office

and she relocated to a conference room. Pl. Dep. 44.

The University's Counseling Services office had gone through an accreditation round with

the International Accreditation of Counseling Services (IACS), which did not give the office full

accreditation, noting that the office diversity did not meet the demographics of the campus as a

whole. Pl. Dep. 57-58. In the Spring of 2019, there were no African-American counselors in the

office, as the only African-American counselor on staff had left. Pl. Dep. 58. During that same

time period, the University undertook an "all campus climate survey" developed by the Office of

Diversity and Inclusion. Climate Survey (ECF No. 47-2). The Counseling Services office planned

to hire "a multicultural person or a person of color because [the] office did not reflect the statistics

of the university as far as diversity." Pl. Dep. 56-57. Plaintiff testified that Dr. Cassidy told the

current counselors that it was the exact same position in the same pay band as them even though

the title of the position was different.[2] Pl. Dep. 59-60. Dr. Cassidy offered the position to Plaintiff

before it was posted but stated that she would not receive a pay raise or a promotion despite having

been promised one previously.[3] Pl. Decl. ¶ 8 (ECF No. 62-1). Plaintiff declined because it was a

twelve-month position and Plaintiff wanted to remain on her ten-and-a-half-month schedule. Pl.

Dep. 60.

Ultimately, Sitonja Valenzuela, an African-American female, was hired for the position.

EEO Report p. 1 (ECF No. 47-3). Plaintiff looked up Valenzuela's salary on the state's salary

website and noted that Valenzuela was paid more than the other counselors in the office. Pl. Dep.

---

2 Plaintiff testified that the title of the position was either Mental Health Specialist or Mental Health Counselor. Pl. Dep. 59.

3 Though Plaintiff's salary would have increased as a result of it being a 12 month position, the rate of pay would've been essentially the same. See footnote 8, infra.

65. Plaintiff testified that she met with Dr. Cassidy in April of 2019, and asked her for an explanation and was told "she's multicultural, so we paid her more money to get her." Pl. Dep. 65. Plaintiff replied "I'm multicultural. What does that mean? And she (Cassidy) said, well, you present white. And I said, you can't say that. And that's race discrimination." Pl. Dep. 66. Plaintiff then had two or three more meetings with Dr. Cassidy where she complained about Valenzuela's salary and the lack of progress in securing a higher salary for herself as discussed in the Fall of 2018. Pl. Dep. 71-72. Dr. Cassidy told Plaintiff that Dr. Conner was looking into it and looking at compression/salary reviews in general.[4] EEO Report p. 1.

In August when Plaintiff returned from the summer break, she took her concerns to Kim Sherfesee, the University's EEO Officer. Pl. Dep. 72; Email Chain Between Pl. and Sherfesee (ECF No. 62-2 pp. 74-77). During her meeting with Sherfesee, Plaintiff explained that she thought it was unfair that someone was hired based on race, and that she was discriminated against based on race and paid less than a less qualified new hire. Pl. Dep. 73. She also told Sherfesee that Dr. Cassidy told her she "presented white" and was not "multicultural enough." Pl. Dep. 73-74. Plaintiff testified that the outcome she sought from her meeting with Sherfesee was to be paid equal to or more than Valenzuela because she was multicultural, too. Pl. Dep. 74. Plaintiff expressed to Sherfesee that she did not want to "ruffle any feathers," and Sherfesee forwarded Plaintiff a copy of the University's retaliation policy. Sherfesee Dep. 40 (ECF No. 47-17); Email Chain Between Pl. and Sherfesee.

Plaintiff also told Sherfesee that she spoke with Valenzuela,[5] who told her that the job offer

---

4 "Salary compression" as understood by the Human Resources department "occurs when the salaries of individuals that are currently employed may not be keeping pace with what the market may be." Sherfesee Dep. 38.
5 Valenzuela is referred to as the "new hire" in the EEO Report.

originally came with a lower salary, but Valenzuela rejected it and was ultimately given more money. EEO Report p. 1. Plaintiff stated that she also requested a higher salary when she returned to the University for employment because the salary was lower than what she was making at the time, but her request was rejected. EEO Report p. 1. Plaintiff informed Sherfesee that she was a Licensed Professional Counselor (LPC) and a Licensed Addictions Counselor in South Carolina, while Valenzuela was not currently certified in South Carolina. EEO Report p. 2; Valenzuela Resume (ECF No. 62-2 pp. 63-67).

On August 23, 2019, Sherfesee and Beverly Landrum, the Vice-President for Human Resources, met with Dr. Conner and Peter Paquette, Associate Vice President for Student Affairs/Dean of Students, to discuss Plaintiff's concerns. EEO Report p. 3. The group discussed that during the recent accreditation review by the IACS, the IACS noted that salaries in the Counseling Office were not at industry level. EEO Report p. 3. Dr. Conner agreed to review the salary issue with Frost[6] in consideration of the budget and consider equity increases. EEO Report p. 3.

On September 13, 2019, Sherfesee and Landrum met with Cassidy to discuss Plaintiff and the other counselors. EEO Report p. 3. Cassidy noted that Plaintiff as well as the other counselors expressed discontent following the posting of Valenzuela's salary on the state website. EEO Report p. 3. Cassidy indicated that there had been discussions regarding the shortage of people of color and when Dr. Conner approached the provost for a higher salary, diversity was a factor used to promote an increase in salary. EEO Report p. 3. She noted that the Counseling Department needed a person of color because diversity is in the strategic plan and accreditors ask what is being

---

6 It is not clear from the record who Frost is.

done to promote diversity. EEO Report p. 3. The group discussed focusing salary actions on what the market commands to attract all candidates (inclusive of diversity) and agreed to research professional salary data, including salaries at other universities. EEO Report p. 4.

In her EEO Report dated October 7, 2019, after discussing the meetings held as a result of Plaintiff's complaint, Sherfesee noted the four specific concerns raised by Plaintiff: (1) Valenzuela was able to negotiate her salary; (2) Plaintiff wanted a higher salary but was not able to negotiate; (3) Plaintiff believes she is more qualified than the new hire who received a higher salary; and (4) Plaintiff does not believe that her salary is equitable in comparison to the recent hire. EEO Report p. 4. Sherfesee stated "[A]s a result of this complaint, Sherfesee assessed the salaries of all existing counselors and counseling services. All counselors, regardless of race, color, or ethnicity with the exception of the recent hire, are experiencing salary compression. This is attributable to the lack of pay increases within the public sector and market demands." EEO Repot p. 4. In her findings, Sherfesee noted that there was evidence of salary compression not tied to a specific race, color, or ethnicity. Sherfesee found that "[i]t did not appear to Sherfesee or Landrum that there was any sort of deliberate act of discrimination by Cassidy towards [Plaintiff] based on race or color." EEO Report p. 5.

The recommendations included in the EEO Report were to address salary compression for all counselors in the Counseling Services Department to remedy the current compression issue, "[i]nitiate dialogue with the Diversity, Equity, and Inclusion, human resources and other campus partners on best practices related to promoting diversity in recruitment while assuring equity, fairness, and proper communication," consider diversity and inclusion training for all departmental employees, and counsel Cassidy on limiting conversation with employees in the department

regarding the salaries of others.  EEO Report p. 5.

On October 8, 2019, Sherfesee met with Plaintiff to inform her that a plan to address her concerns had been forwarded for administrative review and approval, and followed the meeting with a letter dated October 11, 2019, in which Plaintiff was informed she would be receiving a raise.  Letter to Pl. dated 10/11/19 (ECF No. 47-4); Recording 1, No. 2.[7]  In her deposition, Plaintiff agreed that the raise was "very close" to Valenzuela's, but "a little bit less." Pl. Dep. 87-88.[8]

During the investigation into Plaintiff's complaint, on September 27, 2019, an employee requested a meeting with Meredith Canady, Deputy Compliance Officer, and alleged that Plaintiff made derogatory comments about a coworker's sexual orientation.  Letter to Pl. dated 10/3/19 (ECF No. 47-5); Pl. Investigation Report p. 2 (ECF No. 47-6).  Plaintiff was notified of the allegations in a letter dated October 3, 2019, and informed that an investigation would take place. Letter to Pl. dated 10/3/19; Recording 1, No. 1.  On October 4, an attorney retained by Plaintiff, Peter Kaufman, sent a letter[9] expressing his concerns with respect to October 3, 2019, letter and emphasized that it was Plaintiff who was the victim of discrimination.  Kaufman Letter dated 10/4/19 (ECF No. 62-9).  He expressed that the investigation into Plaintiff was in retaliation for her complaints of discrimination.  Kaufman Letter dated 10/4/19.  Kaufman sent another letter on October 14, 2019, reiterating Plaintiff's complaints of discrimination.  Kaufman Letter dated

---

7 All recordings were provided to the Court on a total of four USB drives.
8 At the time, Plaintiff was making $40,074 in her 10.5 month position.  The new job posted for $47,064 for a 12 month position.  At the time of her interview, Valenzuela was making $50,604.  She negotiated for a higher salary more in line with her present salary and was able to secure an increase to $51,000.  EEO Report p. 4.  (In a chart created by Plaintiff and attached to her Declaration, Plaintiff asserts that Valenzuela's salary was $52,000 but does not cite to evidence to support that number.  See Pl. Chart ln. 20 (ECF No. 62-1 p, 18)).  Following the compression study, Plaintiff's salary for her 10.5 month position was increased to $45,517.  Letter to Pl. dated 10/11/19.
9 It is not clear to whom the letter was addressed.  It was sent via email to kbrooks@coastal.edu and began, "Dear Katherine."  Kaufman Letter dated 10/4/19.

7

10/14/19 (ECF No. 62-9).  After interviewing the Complainant, Plaintiff, and numerous coworkers, the Compliance Office concluded in a report dated October 29, 2019, that there was insufficient evidence to support a finding that Plaintiff violated University policies UNIV-466 Title IX Statement of Non-Discrimination or Univ-468, Sexual Misconduct Policy.  Pl. Investigation Report pp. 3-6; Recording 1, No. 4.

However, the Investigation unveiled other concerns regarding Plaintiff's behavior.  First Notice of Written Reprimand (ECF No.  47-7).  Dr. Paquette and Dr. Conner met with Plaintiff on November 14, 2019, regarding concerns of "bullying," "failure to maintain harmonious working relationships and violation of the code of ethical conduct (respect)," "potential breach of confidentiality," and "potential of inappropriate client referrals."   First Notice of Written Reprimand; Recording 1, No. 5.  Dr. Paquette and Interim Director of Counseling Services, Lee Carter, met with Plaintiff again on December 5, 2019, and issued her a Notice of Written Reprimand, which noted that "[t]his written reprimand is intended to impress upon you the seriousness of your actions and is considered reasonable, equitable and warranted.  In the future, it is expected that you will comply with directives.  Failure to do so may result in further disciplinary action, up to, and including termination."   First Notice of Written Reprimand; Recording 1, No. 7.

On October 21, 2019, after Plaintiff's initial meeting with Canady regarding the complaint made against her, Lori Cox met with Plaintiff to find out if she had any concerns regarding office dynamics.  Recording 1, No. 3.  Plaintiff discussed complaints she had with another counselor, Elisa Sperduto, whom she described as not a team player.  Recording 1, No. 3.  She also mentioned that she believed Sperduto was the one that made the unfounded complaint that Plaintiff had made

derogatory statements about another employee's sexual orientation. Recording 1, No. 3. She noted that Sperduto had a problem with her that began before Plaintiff was employed with Counseling Services. Recording 1, No. 3. Plaintiff did not make any complaints regarding discrimination or retaliation during this meeting. Recording 1, No. 3.

Plaintiff had a meeting with Carter on December 2, 2019, and informed her that her complaints of discrimination had not been addressed and were not being investigated. Recording 1, No. 6.

Later in December, Plaintiff made a comment to a coworker, Lee Carter, that there were Christmas decorations in the office but no Hanukkah decorations. Pl. Dep. 148-49. Carter suggested that Plaintiff could purchase Hanukkah decorations and put them up. Pl. Dep. 149. Plaintiff did not know who purchased the Christmas decorations and she did not complain to anyone else about them. Pl. Dep. 149. During her deposition, Plaintiff acknowledged that the decorations at issue—stockings, a Christmas tree, and presents—were not religious symbols. Pl. Dep. 153; Photos of Decorations (ECF No. 47-8).

In the Spring of 2020, Angel Onley-Livingston was hired to replace Dr. Cassidy as the Senior Director of Counseling Services. Pl. Dep. 48. Plaintiff and the other counselors were able to sit in on the interview process for Onley-Livingston and two other applicants as well as review their resumes and provide their input about the applicants. Pl. Dep. 48-49. Plaintiff believed Onley-Livingston had the least relevant experience. Pl. Dep. 48. Dr. Paquette sent Plaintiff an email on April 24, 2020, notifying her that Onley-Livingston would be moving into her office and noted that her new office would have a window and was similar in size to her current office. Paquette Email to Pl. dated 4/24/20 (ECF No. 47-9). He also asked that she pack up her office so

9

that the Facilities team could move it. Paquette Email to Pl. dated 4/24/20. He noted that Onley-Livingston's start date was May 18, 2020. Paquette Email to Pl. dated 4/2/420.

Prior to Plaintiff's summer leave, she had a virtual meeting with Onley-Livingston, in which she informed Plaintiff that she would be making changes to various policies and procedures, including scheduling sessions with students for thirty minutes rather than an hour at the University's direction to see more students and eliminate the wait list. Pl. Dep. 54-55. Plaintiff described that Dr. Cassidy had been flexible and accommodating while Onley-Livingston was more regimented and detailed. Pl. Dep. 91-92. Plaintiff later complained to Dr. Paquette that the schedule was confusing and it changed every day, but he told her that he did not get involved in scheduling matters. Pl. Dep. 96.

Plaintiff testified that other counselors within the department found Onley-Livingston's management style to be confusing and left the department, including Sean Pierce, Susan McLean, Megan Rodriguez, and Tena Nardin. Pl. Dep. 106-08. Nardin testified about the confusing work environment created by Onley-Livingston:

> What would happen is there would be several emails sent to myself about a request. And in the end - - at first, it was denial - - a denial. And then, in the end, it would be an approval via emails. It would be one thing in the email saying 'no'. And then, through a string of emails, miscommunication, convoluted emails, confusing emails back and forth from myself to Angel, in the end she would just approve it.
>  . . .
> She seemed to be argumentative and wouldn't allow autonomy as far as us clinicians were concerned. So if we had any questions, she, like I said earlier, didn't want to answer them, those questions, and always seemed to want to argue about any of the questions that were presented to her, which were always professional.
>  . . .
> So things weren't in place where she thought that they were. So it was just a really confusing work environment. So Erika would try to do one thing and Angel would say, well, you can't do this; this is in the policy. And it wasn't in the policy because the policy changed once a month. We got updates to the policies and the procedures internally once a month, and we didn't know what was in the policy and what was

> not in the policy. So when we would do our duties, we would get reprimanded and be like it's - - it's not in the policy or it's in the policy, so. It's - - it was just very - - just a really confusing work environment.
>
> . . .
>
> It was just a - - a constant battle for things like that to happen when all these forms were involved. Like we had to do form after form after form. Use a form for sick time, use a form for flex time, use a form for, you know, on-call. Every time we wanted to request everything. And so it just – it was just overwhelming, to say the least - - and, like I said, confusing, to say the least.

Nardin Dep. 10, 12, 14 (ECF No. 47-18).  Nardin testified that Onley-Livingston's demands applied to all employees.  Nardin Dep. 9.

Onley-Livingston acknowledged that she received several verbal complaints from Plaintiff regarding a hostile work environment, and she took the complaints to Dr. Paquette and Lori Cox in the Human Resources Office.  Onley-Livingston Dep. 35.  However, she testified she was unaware of any complaints from Plaintiff regarding her pay or that she was being treated differently because of her race.  Onley-Livingston Dep. 35. Plaintiff testified that she told Onley-Livingston that she was currently involved in a case based on discrimination but did not provide further details.  Pl. Dep. 114.

Plaintiff filed her first Charge of Discrimination on June 10, 2020, with the South Carolina Human Affairs Commission (SCHAC).  She alleged discrimination based on race, color, sex, religion, national origin, and retaliation with respect to Valenzuela's hire.  She also alleges that the investigation into her remarks about sexual orientation and the December 5, 2019, written reprimand were attributable to her color, race, religion, sex, national origin, and in retaliation for filing a complaint of discrimination.  First Charge of Discrimination (ECF No. 47-10).

On September 23, 2020, Plaintiff filed a second Charge of Discrimination based on race, religion, nation origin, retaliation, and hostile work environment.  In addition to repeating some

11

allegations raised in the first Charge, Plaintiff also alleges that she has been subjected to additional retaliation since she filed her first Charge and has been subjected to a hostile work environment. Plaintiff alleges that her employer continuously makes her to do things other employees do not have to do, refuses to accommodate her requests for schedule changes, and interferes with her working relationships in order to make her position more difficult to perform. Second Charge of Discrimination (ECF No. 47-11).

On October 8, 2020, Plaintiff was issued a second Notice of Written Reprimand during a meeting with Dr. Paquette and Onley-Livingston. Second Notice of Written Reprimand (ECF No. 47-12). She was reprimanded for failure to maintain harmonious working relationships and violation of the code of ethical conduct (respect), working on personal jobs during work hours, and insubordination and failure to follow office protocol or procedures. Second Notice of Written Reprimand. In the reprimand, Dr. Paquette noted that Plaintiff had already been reprimanded for failure to maintain harmonious working relationships and cited several concerns, including the demeaning tone and manner in which she addressed her colleagues and supervisors in group settings, inattentiveness/disinterest at staff meetings, disrespect towards a University Vice President outside the Counseling Services department, and addressing personal concerns during a staff meeting. Second Notice of Written Reprimand. With respect to working on personal jobs, Plaintiff received a fax at the Counseling Services office from one of her private clients. Second Notice of Written Reprimand. As for insubordination, Plaintiff was cited for failing to make appropriate requests for time off and refusing to use a new consultation form required by her supervisor. Second Notice of Written Reprimand.

Following the meeting, Onley-Livingston agreed to Plaintiff's request for a personal day

off and rescheduled her appointments for the day.  Emails dated 10/8/20 (ECF No. 47-13).  Dr. Paquette followed the meeting with an email to Plaintiff noting that he was confident she and Onley-Livingston could openly discuss issues moving forward and that she had a clear understanding of expectations.  Emails dated 10/8/20.  He also invited Plaintiff to submit a rebuttal to the Second Written Reprimand, which she did.  Emails dated 10/8/20; Pl. Rebuttal to Reprimand (ECF No. 47-14).

In her rebuttal, Plaintiff stated that it was another staff member that was combative and aggressive towards her during a meeting on August 13, 2020.  She also stated that what may have appeared as inattentiveness or disinterest during staff meetings was only her taking notes on a laptop about the meeting.  She would also stand or walk around during meetings at times but had never been told that this was a problem.  Also, during a staff meeting on September 23, 2020, Plaintiff attempted to clarify with Onley-Livingston what she and others found to be confusing, inconsistent, or inaccurate information and/or directions about scheduling and did not believe her questions were personal issues.  Pl. Rebuttal to Reprimand.

Plaintiff also explained in her rebuttal that she had not given a personal client her fax number at the University and the individual must have found the information online.  She also corrected the matter with the individual so that it would not happen again.  Pl. Rebuttal to Reprimand.

With respect to time off, Plaintiff stated that she requested time off for Labor Day weekend and her request was denied while other counselors' requests were granted after hers.  She also requested to switch lunches on September 25, 2020 with another counselor, Sean Pierce, and Onley-Livingston originally told Pierce he could not switch lunches with her, but the next day the

request was approved but Onley-Livingston only notified Pierce of the approval and not Plaintiff. Pl. Rebuttal to Reprimand.

Finally, as to the new consultation form, Plaintiff stated that she did not refuse to use the form as indicated in the reprimand, but it was not saving correctly on her computer and she brought that to Onley-Livingston's attention. She attempted to comply as much as possible with the required form by using the exact language from the consultation form in another document and by putting in a work request with IT. Pl. Rebuttal to Reprimand.

## III.    STANDARD OF REVIEW

Under Fed.R.Civ.P. 56, the moving party bears the burden of showing that summary judgment is proper. Summary judgment is proper if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof. Id. Once the moving party has brought into question whether there is a genuine dispute for trial on a material element of the non-moving party's claims, the non-moving party bears the burden of coming forward with specific facts which show a genuine dispute for trial. Fed.R.Civ.P. 56(e); Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986). The non-moving party must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could reasonably find for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The facts and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory

14

allegations to defeat a motion for summary judgment. Barber v. Hosp. Corp. of Am., 977 F.2d 874-75 (4th Cir. 1992). The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

To show that a genuine dispute of material fact exists, a party may not rest upon the mere allegations or denials of his pleadings. See Celotex, 477 U.S. at 324. Rather, the party must present evidence supporting his or her position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed.R.Civ.P. 56(c)(1)(A); see also Cray Communications, Inc. v. Novatel Computer Systems, Inc., 33 F.3d 390 (4th Cir. 1994); Orsi v. Kickwood, 999 F.2d 86 (4th Cir. 1993); Local Rules 7.04, 7.05, D.S.C.

## IV. DISCUSSION

Four causes of action remain in this case: (1) race discrimination in violation of Title VII and 42 U.S.C. § 1981 against the University; (2) retaliation for complaints regarding race discrimination, national origin discrimination, and hostile work environment in violation of Title VII and 42 U.S.C. § 1981 against the University; (3) hostile work environment in violation of Title VII and 42 U.S.C. § 1981 against the University; and, (4) a state law cause of action for slander against Onley-Livingston.

### A. Race Discrimination

Title VII makes it "an unlawful employment practice for an employer-(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with

respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin...." 42 U.S.C. § 2000e–2(a)(1). Section 1981 states, in relevant part, that "[a]ll persons ... shall have the same right ... to make and enforce contracts ... as is enjoyed by white citizens." 42 U.S.C § 1981.

A plaintiff asserting a claim of unlawful employment discrimination may proceed through two avenues of proof. First, he may establish through direct or circumstantial proof that a protected characteristic such as race was a motivating factor in the employer's adverse decision. See Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310, 318 (4th Cir. 2005). When direct evidence is lacking, a plaintiff may proceed under the burden-shifting proof scheme established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Plaintiff here proceeds under the McDonnell Douglas burden-shifting scheme. Under this burden-shifting scheme, Plaintiff has the initial burden of establishing a prima facie case of discrimination, which "var[ies] depending on the nature of the case." Briggs v. Waters, 484 F. Supp. 2d 466, 477 (E.D. Va. 2007).

If Plaintiff establishes a prima facie case, "a presumption of illegal discrimination arises, and the burden of production shifts to the employer" to produce evidence of a legitimate, non-discriminatory reason for its adverse employment action. Hoyle v. Freightliner, LLC, 650 F.3d 321, 336 (4th Cir. 2011); Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000); Hurst v. District of Columbia, 681 Fed.Appx. 186, 190, 2017 WL 908208, at *3 (4th Cir. Mar. 7, 2017) (per curiam).This is merely a burden of production, not of persuasion. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

Once Defendant has met its burden of production by producing a legitimate,

nondiscriminatory reason, the sole remaining issue is "discrimination vel non." <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 5 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (citing <u>Postal Service Bd. of Governors v. Aikens</u>, 460 U.S. 711, 716, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983)). In other words, the burden shifts back to Plaintiff to demonstrate by a preponderance of the evidence that the legitimate reason produced by Defendant is not its true reason, but was pretext for discrimination. <u>Reeves</u>, 530 U.S. at 143. Throughout the burden shifting scheme set forth in <u>McDonnell Douglas</u>, the ultimate burden of proving that Defendant intentionally discriminated against Plaintiff remains at all times with Plaintiff. Plaintiff has the ultimate burden of presenting evidence from which a reasonable jury could conclude Defendant intentionally discriminated against her.  <u>Texas Dept. of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981).

To state a prima facie case for disparate treatment based on race in violation of Title VII or § 1981, Plaintiff must show "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." <u>Coleman v. Md. Court of Appeals</u>, 626 F.3d 187, 190 (4th Cir. 2010) (citation omitted), aff'd, 566 U.S. 30 (2012); <u>Gairola v. Com. of Va. Dep't of Gen. Servs.</u>, 753 F.2d 1281, 1285 (4th Cir. 1985) (noting the standards applicable to suits under Title VII are also applicable to suits brought under Section 1981); <u>Love–Lane v. Martin</u>, 355 F.3d 766, 786 (4th Cir. 2004) (evaluating Section 1981 racial discrimination claim and a Title VII racial discrimination claim under the same prima facie case framework).  The fourth element can also be shown by presenting evidence that the adverse employment action occurred "under circumstances giving rise to an inference of unlawful discrimination." <u>Adams v. Trustees of the Univ. of N.C.-Wilmington</u>, 640 F.3d 550, 558 (4th Cir. 2011).

For purposes of their motion for summary judgment, Defendants acknowledge that Plaintiff meets the first and second prongs of a prima facie case of discrimination as set forth above. However, they argue that Plaintiff fails to show that she suffered an adverse employment action giving rise to an inference of unlawful discrimination. It is undisputed that the IACS did not give the counseling department full accreditation because the demographics within the counseling department did not reflect the demographics of the University as a whole. As a result, in the Spring of 2019, the University sought to hire a multicultural person or a person of color as a counselor.[10] Though the position was offered to Plaintiff prior to its posting, Plaintiff declined the offer because she was told it was the same position she currently held, within the same pay band, although it was a twelve-month, rather than a ten-month position and would have a different title, but did not come with an increase in salary. However, after Valenzuela, an African-American counselor, was hired for the position, Plaintiff learned that her salary was higher than Plaintiff's, even taking into account that it was a twelve-month position. When Plaintiff asked her then-supervisor, Dr. Cassidy, about the difference in pay, Dr. Cassidy stated, "she's multicultural, so we paid her more money to get her" along with a comment that Plaintiff was not multicultural enough and presented white. Pl. Dep. 65-66. Valenzuela told Plaintiff that the initial salary posted for the position was less but she negotiated a higher salary commensurate with the salary she was receiving at the time. "Disparate pay is an adverse employment action under Title VII." Horton v. Walmart, Inc., No. 5:20-CV-00107, 2021 WL 3013365, at *4 (W.D. Va. July 16, 2021) (quoting Bowen v. Manheim Remarketing, Inc., 882 F.3d 1358, 1364 (11th Cir. 2018)). Thus, Plaintiff has

---

10 See Bernstein v. St. Paul Companies, Inc., 134 F. Supp. 2d 730, 739 n.12 (D. Md. 2001) (noting that an employer's "commitment to 'diversity,' if expressed in terms of creating opportunities for employees of different races ..., is not proof of discriminatory motive with respect to any specific hiring decision," and that "it would be difficult to find today a company of any size that does not have a diversity policy").

presented sufficient evidence to make a prima facie showing of discrimination with respect to her salary.

Plaintiff argues that she also suffered several other adverse employment actions, including two written reprimands, one verbal reprimand, two threats of further discipline, and a Title XII investigation "that was based on information from disgruntled employees." Pl. Resp. p. 40 (ECF No. 62). An adverse employment action is a discriminatory act that "adversely affects the terms, conditions, or benefits of the plaintiff's employment." Holland v. Washington Homes, Inc., 487 F.3d 208, 219 (4th Cir. 2007) (quoting James v. Booz-Allen & Hamilton. Inc., 368 F.3d 371, 375 (4th Cir. 2004)). Examples include "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion[.]" Boone v. Goldin, 178 F.3d 253, 255 (4th Cir. 1999). It is well established that, without more, "neither [ ] written nor [ ] verbal reprimands qualify as adverse employment actions." Adams v. Anne Arundel Cnty. Pub. Sch., 789 F.3d 422, 429 (4th Cir. 2015). The Fourth Circuit has held that "receipt of a letter of warning did amount to an adverse action because [plaintiff's supervisor] warned [plaintiff] that future disciplinary actions could result in further discipline, including termination." Barnes v. Charles Cty. Pub. Schools, 747 Fed. App'x 115, 119 (4th Cir. 2018) (per curiam). Here, both written reprimands, received by Plaintiff on December 5, 2019, and October 8, 2020, contained warnings that "[f]ailure to comply [with these directives] may result in further disciplinary action, up to, and including termination." First Notice of Written Reprimand; Second Notice of Written Reprimand. Thus, these written reprimands can be considered adverse employment actions. There is no evidence in the record that any verbal reprimand contained a warning of future termination or otherwise adversely affected the terms, conditions, or benefits of Plaintiff's employment. Thus,

any verbal reprimand is not sufficient to satisfy the adverse employment action requirement. Likewise, the Title XI investigation does not amount to an adverse employment action.  See Jenkins v. Balt. City Fire Dept., 862 F. Supp. 2d 427, 445–46 (D. Md. 2012) (granting summary judgment against plaintiff on disparate investigation claim), aff'd, 519 F. App'x 192 (4th Cir. 2013) (unpublished per curiam); Fulmore v. City of Greensboro, 834 F. Supp. 2d 396, 417 (M.D.N.C. 2011) (holding investigation alone does not constitute an adverse employment action); Dawson v. Rumsfeld, No. 1:05-CV-1270 (JCC), 2006 WL 325867, at *6 (E.D. Va. Feb. 8, 2006) (reasoning from Fourth Circuit precedent that "the mere decision to initiate an investigation is not an adverse employment action" and citing cases); Hoffman v. Balt. Police Dept., 379 F. Supp. 2d 778, 792–93 (D. Md. 2005) ("The few courts that have considered whether an investigation, by itself, can constitute an adverse employment action have answered that question in the negative.").  The complaint made against Plaintiff was determined to be unfounded, and no action was taken against her.

Nevertheless, even though the written reprimands received by Plaintiff can be considered adverse employment actions, Plaintiff has failed to present evidence sufficient to show that these actions were taken against her because of her national origin, race, or color.  She states generally that African-Americans in the office were not subjected to discipline for the same actions for which she received discipline.  When "a plaintiff attempts to rely on comparator evidence to establish circumstances giving rise to an inference of unlawful discrimination," the plaintiff must demonstrate at trial that the comparator is similarly situated in all relevant respects. Swaso v. Onslow Cnty. Bd. of Educ., 698 F. App'x 745, 748 (4th Cir. 2017).  This includes "that the employees 'dealt with the same supervisor, [were] subject to the same standards and...engaged in

the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" Haywood v. Locke, 387 F. App'x 355, 359 (4th Cir. 2010) (quoting Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992)). Plaintiff fails to identify who those employees were,[11] much less that they were similarly situated in all relevant respects. Because of her failure to show that she received written reprimands because of her national origin, race, or color, Plaintiff has presented sufficient evidence to establish a prima facie case of discrimination only as to the pay discrepancy between her and Valenzuela.

Accordingly, the burden-shifts to Defendants to present a legitimate, nondiscriminatory reason for the pay discrepancy. Defendants state that the discrepancy was due to salary compression and affected all counselors (other than Valenzuela, the newest hire), not just Plaintiff. When Plaintiff brought her complaint regarding the pay discrepancy to Sherfesee, she and Beverly Landrum, the Vice-President for Human Resources, met with Dr. Conner and Peter Paquette, Associate Vice President for Student Affairs/Dean of Students, to discuss Plaintiff's concerns. EEO Report p. 3. The group noted that during the recent accreditation review by the IACS, the IACS noted that salaries in the Counseling Office were not at industry level. EEO Report p. 3. The group agreed that a review of the salary issue was appropriate. EEO Report p. 3. During the salary review, Sherfesee assessed the salaries of all existing counselors and counseling services. She determined that all counselors, regardless of race, color, or ethnicity with the exception of Valenzuela were experiencing salary compression which was attributable to the lack of pay increases within the public sector and market demands. EEO Report p. 4. In her

---

[11] Plaintiff specifically testified that during the accreditation review prior to Valenzuela's hire, the counseling department had no African-American counselors. Pl. Dep. 58. Upon Valenzuela's hire on April 1, 2019, she was the only African-American counselor.

findings, Sherfesee noted that there was evidence of salary compression not tied to a specific race, color, or ethnicity. Sherfesee found that "[i]t did not appear to Sherfesee or Landrum that there was any sort of deliberate act of discrimination by Cassidy towards [Plaintiff] based on race or color." EEO Report p. 4. As a result, Plaintiff received an increase in her salary. In addition, Defendants argue, it is undisputed that Plaintiff was offered the position ultimately awarded to Valenzuela, but she turned it down. Defendants' burden here is one of production, not persuasion. Thus, because Defendants have presented a legitimate, nondiscriminatory reason for the difference in pay, the burden returns to Plaintiff to show that the reason given by Defendants is pretext for a discriminatory reason.

Plaintiff must show "by a preponderance of the evidence that the legitimate reasons offered by the [D]efendant[s] were not ... [their] true reasons, but were a pretext for discrimination." Reeves, 530 U.S. at 143. "The Fourth Circuit has clearly held that, at a minimum, proof of pretext is required to survive" a motion for summary judgment. Gary v. Freightliner, 394 F. Supp. 2d 773, 777–78 (W.D.N.C. 2005), aff'd sub nom. Gary v. Freightliner LLC., 169 F. App'x 756 (4th Cir. 2006). Plaintiff does not directly address Defendants' assertion that the legitimate, nondiscriminatory reason for the discrepancy in salary was salary compression rather than discrimination.[12] She argues that Defendants' contention that it did not intend to discriminate

---

[12] Elsewhere in her response, Plaintiff asserts that the discrepancy in pay "was not the overall substance of her complaint" and that Defendants were "sweeping her discrimination complaint under the rug." Pl. Resp. p. 12. She states that her complaint regarded the multicultural comments and the inquiry as to whether a name was an African-American name. She asserts though she was concerned over the salary, the "bigger concern was the differential treatment based on race." Pl. Resp. p. 13. However, the only evidence of differential treatment is the pay discrepancy. As set forth above, for employment discrimination to be actionable under Title VII or § 1981, the employee must have suffered an adverse employment action that resulted from unlawful discrimination. See Coleman, 626 F.3d at 190. Thus, the discrepancy in pay is a necessary component to her claim of discrimination. While it is possible that the multicultural comments are relevant to a hostile work environment claim, discussed in more detail below, with respect to her disparate treatment claim, such comments are relevant only to the extent they led to an adverse employment action.

against her is incorrect given Dr. Cassidy's statement that Plaintiff was not multicultural enough and presented white. Indeed, when Plaintiff asked Dr. Cassidy why Valenzuela was making more money than her, she answered "well, she's multicultural, so we paid her more money to get her." Pl. Dep. 65. Dr. Cassidy offered the same position to Plaintiff before it was posted because she thought Plaintiff might want a twelve-month position and Plaintiff declined. However, Plaintiff argues that she only declined the position because she was told the position was not a promotion and would not come with a pay raise which, she claims, was false as evidenced by the fact that Valenzuela ultimately received a higher salary than Plaintiff. While it is true that the position was offered to Valenzuela at the same pay rate it was offered to Plaintiff, Valenzuela was able to negotiate for a higher salary and Plaintiff was not. The specific details of Plaintiff's conversation with Dr. Cassidy are not apparent in the record. Nevertheless, after the fact, as stated above, when Plaintiff asked why Valenzuela was making more than her, Dr. Cassidy explained that they paid her more "to get her" because she was multicultural. When Plaintiff told Dr. Cassidy that she was multicultural, too, Dr. Cassidy replied that she "presented white" and was "not multicultural enough." Pl. Dep. Thus, drawing all reasonable inferences in Plaintiff's favor, which we must at this stage of the litigation, see Verisign, Inc. v. XYZ.COM LLC, 848 F.3d 292, 298 (4th Cir. 2017), the reason the position and increased pay was not afforded to Plaintiff is because she presented white and was not multicultural enough. Ultimately, Plaintiff was given two different reasons why Valenzuela was paid more than her: (1) because Plaintiff was not multicultural enough, and (2) as a result of salary compression, which affected all previously hired counselors. An employer advancing differing reasons for an adverse employment action can be evidence of pretext for a discriminatory reason. See Wilson v. Phoenix Specialty Mfg. Co., 513 F.3d 378, 387 (4th Cir.

2008).

While a reasonable juror could conclude that the discrepancy in pay was a result of salary compression, he or she could just as easily conclude that it was because Plaintiff was too white, which is unlawful under Title VII and § 1981.[13]  In that, a dispute of fact exists, making summary judgment inappropriate on Plaintiff's Title VII and § 1981 claim of discrimination regarding pay.

## B.    Retaliation

Plaintiff also alleges a claim for retaliation. Title VII makes it an "unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).  Further, § 1981 allows a "complaint of retaliation against a person who has complained about violation of another person's contract-related right."

---

13 In the light most favorable to Plaintiff, the evidence suggests Defendant discriminated against Plaintiff not because she is of Jamaican, Chinese, and Spanish descent; rather, the evidence suggests Defendant discriminated against her because she was not as "multicultural" as Valenzuela.  Though this is not a claim of reverse discrimination, it is akin to it in that Plaintiff was regarded as white (to borrow a term from the ADA).  The Supreme Court has held that "Title VII protects whites as well as minorities." Farmer v. Ramsay, 43 F. App'x 547, 553 n.8 (4th Cir. 2002); see also McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 287 (1976) (addressing § 1981: While a mechanical reading of the phrase "as is enjoyed by white citizens" would seem to lend support to respondents' reading of the statute, we have previously described this phrase simply as emphasizing "the racial character of the rights being protected.").  As noted above, "an employer's "commitment to 'diversity,' if expressed in terms of creating opportunities for employees of different races ..., is not proof of discriminatory motive with respect to any specific hiring decision.'" Bernstein v. St. Paul Companies, Inc., 134 F. Supp. 2d 730, 739 n.12 (D. Md. 2001).  In addition, making an employment decision in accordance with an affirmative action plan can be a legitimate, nondiscriminatory reason for that employment decision if the meets certain requirements.  See Johnson v. Transp. Agency, Santa Clara County, Cal., 480 U.S. 616, 626, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987) (providing that an employer's voluntary affirmative action plan is not a violation of Title VII if (1) its purpose is similar to that of Title VII, namely to "break down old patterns" of discrimination; (2) the plan does not "unnecessarily trammel" the rights of those outside the group that it is designed to protect; and (3) it is designed to eliminate a manifest racial or sexual imbalance).  However, Defendant does not argue that any such plan was the reason for the pay discrepancy between Plaintiff and Valenzuela.  Only Dr. Cassidy mentioned the need for a person of color in the counseling department, and made vague reference to a "strategic plan," see EEO Report p. 3, but the record does not reveal the existence or nature of said plan.  Nevertheless, in support of its motion for summary judgment, Defendant argues only that the reason for the pay discrepancy was salary compression.

CBOCS West, Inc. v. Humphries, 553 U.S. 442, 445 (2008). The McDonnell Douglas burden-shifting scheme set forth above also applies to retaliation claims. A prima facie case of retaliation requires that: (1) the plaintiff engaged in protected activity; (2) her employer took an adverse action against her; and (3) a causal relationship existed between the plaintiff's protected activity and her employer's adverse action. See Guessous v. Fairview Prop. Investments, LLC, 828 F.3d 208, 217 (4th Cir. 2016). If Plaintiff establishes a prima facie case, Defendants can rebut the presumption of retaliation by articulating a non-retaliatory reason for its actions. At that point, Plaintiff must present evidence sufficient to create a genuine issue of material fact that Defendants' legitimate, non-retaliatory reason is pretextual. Matvia v. Bald Head Island Management, 259 F.3d 261, 271 (4th Cir. 2001).

Protected activity involves opposing an unlawful employment practice which the plaintiff reasonably believed had occurred or was occurring. Peters v. Jenney, 327 F.3d 307, 320 (4th Cir. 2003). Title VII protects an employee who opposes "any practice made an unlawful employment practice," 42 U.S.C. § 2000e-3(a), or who "reasonably believes" she is opposing a practice made an unlawful practice by Title VII. E.E.O.C. v. Navy Fed. Credit Union, 424 F.3d 397, 406 (4th Cir. 2005). The Fourth Circuit has "articulated an expansive view of what constitutes oppositional conduct, recognizing that it encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." DeMasters v. Carilion Clinic, 796 F.3d 409, 417 (4th Cir. 2015) (internal quotation marks omitted). Filing an EEOC charge is also a protected activity. 42 U.S.C. § 2000e–3(a). "Protected activity does not include generalized employment-related complaints unrelated to Title VII prohibited discrimination." Sung Kun Kim v. Panetta, No. 1:11-cv-1370

(LMB/TCB), 2012 WL3600288, at * 17 (E.D. Va. Aug. 21, 2012).  Plaintiff engaged in protected activity several occasions.  She first complained of race discrimination in connection with Valenzuela's hire and the pay discrepancy in a conversation with Dr. Cassidy in April of 2019.  On August 7 or 8, 2019, shortly after she returned from her summer break, Plaintiff again raised the discrimination issue with Dr. Cassidy and then with Sherfesee.  On October 4 and October 14, 2019, counsel for Plaintiff sent letters to the University reiterating Plaintiff's claims of discrimination.  See, e.g., Young v. Giant Food Stores, LLC, 108 F. Supp. 3d 301, 317–18 (D. Md. 2015) (holding that a letter sent from an attorney on behalf of a Plaintiff setting forth alleged discrimination is a protected activity for Title VII retaliation purposes).  Plaintiff also filed two complaints of discrimination with outside agencies:  On June 10, 2020, Plaintiff filed a Charge of Discrimination with the South Carolina Human Affairs Commission (SCHAC).  She alleged discrimination based on race, color, sex, religion, national origin, and retaliation with respect to Valenzuela's hire.  On September 23, 2020, Plaintiff filed a second Charge of Discrimination based on race, religion, nation origin, retaliation, and hostile work environment.  In addition to repeating some allegations raised in the first Charge, Plaintiff also alleged that she has been subjected to additional retaliation since she filed her first Charge and has been subjected to a hostile work environment.

Plaintiff must also show that the suffered an adverse action.  An adverse action "need not be employment or workplace-related in order to sustain a retaliation claim." Strothers v. City of Laurel, Maryland, 895 F.3d 317, 327 (4th Cir. 2018); see also Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53, 64 (2006)("[T]he antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions

of employment."); Barnes v. Charles Cty. Pub. Schools, 747 Fed. App'x 115, 119 (4th Cir. 2018) (per curiam) ("An adverse action need not affect the terms and conditions of employment" in a retaliation claim.). Thus, "[t]he scope of Title VII's anti-retaliation provision ... is broader than the anti-discrimination provision." Strothers, 895 F.3d at 327. Nevertheless, the adverse action taken by the employer against the plaintiff must still be materially adverse because "[t]he antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." Burlington Northern, 548 U.S. at 67. "An action is materially adverse if, from an objective point of view, 'it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Smith v. Vilsack, 832 F. Supp. 2d 573, 585 (D. Md. 2011) (quoting Burlington Northern, 548 U.S. at 68).

As discussed above, Plaintiff's written reprimands, which included warnings that she could be subject to further discipline, including termination, are adverse actions. Further, while the Title IX investigation was not sufficient to constitute an adverse employment action for purposes of a discrimination cause of action, initiating an investigation into an employee who recently complained of discrimination might reasonably dissuade that employee from making or supporting a charge of discrimination. Thus, in the retaliation context, an investigation such as the one initiated against Plaintiff is sufficient to constitute an adverse action.

Of course, there must be a causal connection between the adverse actions and the protected activity. "[A] causal connection for purposes of demonstrating a prima facie case exists where the employer takes adverse employment action against an employee shortly after learning of the protected activity." Price v. Thompson, 380 F.3d 209, 213 (4th Cir. 2004), abrogated on other grounds by Foster v. Univ. of Md.-E. Shore, 787 F.3d 243, 253 (4th Cir. 2015). However, the

temporal nexus between two events cannot provide proof of causation unless the "temporal proximity between an employer's knowledge of protected activity and an adverse employment action" was "very close." Clark County School District. v. Breeden, 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (internal quotation marks omitted). A "'lengthy time lapse between the [defendant's] becoming aware of the protected activity and the alleged adverse ... action'" often "'negates any inference that a causal connection exists between the two.'" Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 501 (4th Cir. 2005) (citation omitted).

Plaintiff complained to Sherfesee about discrimination on August 8, 2019. Plaintiff was first informed on October 3, 2019, that complaints had been made against her and an investigation was going to be opened, while the investigation into her own complaints of discrimination was ongoing. On October 4, 2019, and October 14, 2019, counsel for Plaintiff sent letters to the University reiterating Plaintiff's claims of discrimination and that the recently opened investigation was retaliation for her discrimination complaints. Plaintiff was then issued her first written reprimand on December 5, 2019. Thus, Plaintiff suffered an adverse employment action approximately seven weeks after she engaged in protected activity. No "bright temporal line" exists when determining whether a causal connection exists between a protected activity and adverse action as a result of temporal proximity. See Perry v. Kappos, 489 F. App'x 637, 643 (4th Cir. 2012) ("Although neither we nor the Supreme Court have adopted a bright temporal line, we have held that a three- or four-month lapse between the protected activities and discharge was 'too long to establish a causal connection by temporal proximity alone'"). However, the Fourth Circuit has held that "a period of longer than two months between the protected activity and the adverse action 'significantly weakens the inference of causation.'" Roberts v. Glenn Indus. Grp., Inc., 998

F.3d 111, 127 (4th Cir. 2021).  Thus, the necessary implication is that a period of time less than two months is sufficient to create an inference of causation.  Though the inference may be weaker at seven weeks than it would be at six, <u>see</u> <u>e.g.</u>, <u>Fields v. Washington Cnty. Serv. Auth.</u>, No. 1:20CV00001, 2021 WL 3510677, at *6 (W.D. Va. Aug. 10, 2021) ("noting that seven weeks "approaches a duration which the Fourth Circuit has found 'weaken[s] significantly the inference of causation"); <u>Carter v. Ball</u>, 33 F.3d 450, 460 (4th Cir. 1994) (finding temporal proximity where an employee was demoted six weeks after a hearing on his EEO complaint), it is sufficient to establish a prima facie case of retaliation.

Furthermore, her second written reprimand occurred on October 8, 2020, a little over two weeks after Plaintiff filed her second Charge of Discrimination on September 23, 2020.  There is sufficient temporal proximity to create a causal connection between these two events.  Thus, a prima facie case of retaliation exists.

As with Plaintiff's discrimination claim, the burden shifts to Defendants to produce a legitimate, non-retaliatory reason for the adverse actions.  However, Defendants argue only that Plaintiff cannot establish a prima facie case of retaliation and do not address a legitimate, non-retaliatory reason for the adverse action.  Therefore, summary judgment should be denied on Plaintiff's claim of retaliation.

### C.    Hostile Work Environment

Plaintiff also asserts that she suffered a hostile work environment because of her national origin. "Because 'an employee's work environment is a term or condition of employment, Title VII creates a hostile working environment cause of action.'" <u>Crockett v. Mission Hosp., Inc.</u>, 717 F.3d 348, 354 (4th Cir. 2013) (quoting <u>EEOC v. R&R Ventures</u>, 244 F.3d 334, 338 (4th Cir.

29

2001)).  Plaintiff must show that she suffered from harassment that was (1) unwelcome, (2) based on a protected status, (3) sufficiently severe or pervasive to alter the conditions of her employment and create an abusive atmosphere, and (4) imputable to the employer. EEOC v. C. Wholesalers, Inc., 573 F.3d 167, 175 (4th Cir. 2009); Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 373, 124 S.Ct. 1836, 158 L.Ed.2d 645 (2004) (recognizing that hostile work environment claims may be brought under § 1981).  "While the first element is subjective, the rest of the test is made up of objective components based on a 'reasonable person' standard."  Robinson v. Priority Auto. Huntersville, Inc., 70 F.4th 776, 781-82 (4th Cir. 2023).

To establish that harassment creating a hostile work environment was based on a protected status, such as national origin, Plaintiff must show that but for her national origin, she would not have been the victim of the alleged harassment. See Pueschel v. Peters, 577 F.3d 558, 565 (4th Cir. 2009). A plaintiff alleging harassment "can succeed only by showing that she is the individual target of open hostility because of her [protected status]," not simply alleging that "she was the target of open hostility." Ziskie v. Mineta, 547 F.3d 220, 226 (4th Cir. 2008) (internal quotation and citations omitted). Plaintiff must show that the alleged harassment was motivated by actual animus towards her protected trait. Gilliam v. S.C. Dep't Of Juv. Just., 474 F.3d 134, 142–43 (4th Cir. 2007). A plaintiff must also establish that any racially offensive conduct was directed at her. See Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 190–91 (4th Cir. 2004).

"Element three of a hostile work environment claim [sufficiently severe or pervasive] requires a showing that 'the environment would reasonably be perceived, and is perceived, as hostile or abusive.'" Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 277 (4th Cir. 2015) (citing Harris v. Forklift Systems. Inc., 510 U.S. 17, 22 (1993)). The conduct must be both

subjectively and objectively offensive in order to be cognizable under Title VII. Harris, 510 U.S. at 21–22. To be expected, courts often assume the conduct is subjectively offensive. See Ziskie v. Mineta, 547 F.3d 220, 227 (4th Cir. 2008). "[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (quoting Harris, 510 U.S. at 23, 114 S.Ct. 367). Factors to consider include "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance." Smith v. First Union Nat'l Bank, 202 F.3d 234, 242 (4th Cir. 2000). Harassment is severe or pervasive only if the workplace is "pervaded with discriminatory conduct aimed to humiliate, ridicule, or intimidate." EEOC v. Sunbelt Rentals, Inc., 521 F.3d 306, 316 (4th Cir. 2008) (internal quotation marks omitted). Rude treatment, callous behavior, and a routine difference of opinion and personality conflict do not suffice to state a hostile work environment claim. Id. at 315–16. "[S]imple teasing, off-hand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (internal citations and quotation marks omitted). The Fourth Circuit has "recognized that plaintiffs must clear a high bar in order to satisfy the severe or pervasive test." Sunbelt Rentals, Inc., 521 F.3d at 315.

Though Plaintiff frequently complained to Defendants about the hostile work environment she was enduring, she is not clear what actions occurred that created that hostile environment. She asserts that she suffered from a hostile work environment by being told she presented white and

was not multicultural enough, being investigated for claims that were ultimately determined to be unfounded, receiving reprimands, and her constant clashing with Onley-Livingston. Though the comment by Dr. Cassidy that Plaintiff presented white and was not multicultural enough, was based on her national origin, it was an isolated comment. There is no other evidence of comments by Dr. Cassidy or anyone else regarding Plaintiff's color, national origin, or race. As stated above, "off-hand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Faragher, 524 U.S. at 788. Plaintiff does not identify any other specific, harassing behavior by Dr. Cassidy. Further, by at least November of 2019, Dr. Cassidy was no longer employed by the counseling department. The bulk of Plaintiff's complaints regarding hostile treatment occurred after Dr. Cassidy was gone.

As noted above, though Plaintiff frequently complained about her hostile working environment, the evidence in the record is insufficient to make a determination as to whether any alleged harassment was severe or pervasive. Further, unfair discipline generally does not constitute the kind of "discriminatory intimidation, ridicule, and insult," Boyer-Liberto, 786 F.3d at 277, or "physically threatening or humiliating" conduct, EEOC v. Cent. Wholesalers, Inc., 573 F.3d 167, 176 (4th Cir. 2009), that typically underlies a hostile work environment claim. See, e.g., Hill v. Hagel, 561 F. App'x 264, 265–66 (4th Cir. 2014) (finding that the plaintiff's allegations of unfair evaluations, placement on a performance improvement plan, removal of supervisory duties, suspensions, leave restrictions, and revocation of a security clearance did not support hostile work environment claim under Title VII); Graham v. Prince George's Cnty., 191 F. App'x 202, 204–05 (4th Cir. 2006) (affirming the district court's determination that a supervisor's harsh reprimands about an employee's performance were not sufficiently severe or pervasive to create a hostile work

environment); Roberts v. Off. of the Sheriff for Charles Cnty., No. DKC-10-3359, 2012 WL 12762. at *7 (D. Md. Jan. 3, 2012) (finding that the imposition of disparate disciplinary sanctions and denial of training did not create a hostile work environment).

Nevertheless, even if the remaining behavior complained of by Plaintiff could be considered severe or pervasive, there is no evidence in the record that it was based on any protected status. "[T]he sort of workplace behaviors that Title VII serves to root out [are] repeated invectives of an overtly racial tenor." Laurent-Workman v. Wormuth, 54 F.4th 201, 212 (4th Cir. 2022). Plaintiff must point to "instances where the environment was pervaded with discriminatory conduct aimed to humiliate, ridicule, or intimidate, thereby creating an abusive atmosphere." Sunbelt Rentals, Inc., 521 F.3d at 316 (internal quotation marks omitted). There is no evidence in the record that the alleged harassment was motivated by actual animus towards Plaintiff's protected trait. Gilliam, 474 F.3d at 142–43. Accordingly, summary judgment is appropriate on Plaintiff's hostile work environment claim.

### D.    Slander

Plaintiff also asserts a state law cause of action for slander against Onley-Livingston. Slander is the spoken form of defamation. Swinton Creek Nursery v. Edisto Farm Credit, ACA, 334 S.C. 469, 484, 514 S.E.2d 126, 133-34 (1999) (citation omitted). The tort of defamation allows a plaintiff to recover when a defendant communicates a false message about the plaintiff to others that injures the plaintiff's reputation. McBride v. Sch. Dist. of Greenville Cty., 389 S.C. 546, 559, 698 S.E.2d 845, 852 (Ct. App. 2010). A party asserting a claim of defamation must prove the following elements: "(1) a false and defamatory statement was made; (2) the unprivileged publication of the statement to a third party; (3) the publisher was at fault; and (4) either the

statement was actionable irrespective of harm or the publication of the statement caused special harm."[1] Williams v. Lancaster Cty. Sch. Dist., 369 S.C. 293, 302–03, 631 S.E.2d 286, 292 (Ct. App. 2006).

In her complaint, Plaintiff alleges that Onley-Livingston intentionally placed Plaintiff in a false light and slandered her to other employees when she sent an email to both her and Paquette on August 18, 2021:

> In my discussion with Erika in our 1-on-1 she made it very clear that she has been having discussions with others in this office about how she doesn't feel like she is a part of a team anymore and this is not a team atmosphere and that is how others feel as well. She has asked for an open floor discussion with all staff to talk out loud in the staff meeting about this. This will not happen because Erika has proved on many occasions why she cannot be trusted in a staff meeting with open discussions. Erika continues to bring up how things were in the past with her team and how things are now. I can't fix what she wants to experience. I will not continue to be egged on or pushed by her with questions of why don't you fire me. I will not be having my 1-on-1 with Erika . . . because I tried that today and she turned it into this. She asked for clarity, which she will be given today when we hand out the Policies and Procedures at 5:00 for all staff for inner office proceedings.
>
> I am requesting a meeting with you and Erika Pomerantz to discuss her position here as an employee in CS and her willingness to complete her job duties and to just create and keep a harmonious environment. Erika today did not follow an inner office procedure which I was willing to overlook that was in place since last semester, due to her just returning from the Summer and getting back in the day-to-day process. Erika seems to be happy with our interactions and relationship at work, as long as I let her take off days on a continuous basis as requested. I also suggested as I had before that she should have applied for the Clinical Director position if she wants to make departmental decisions.
>
> I will not be bullied, manipulated or gaslighted on a continual basis this year by Erika Pomerantz. I am asking that the university review her being in this

---

[1] With respect to the fourth element, defamation that is actionable irrespective of special harm is defamation per se, which includes defamatory statements regarding 1) the commission of a crime, 2) contraction of a loathsome disease, 3) adultery, 4) unchastity, or 5) unfitness in one's business or profession. Fountain v. First Reliance Bank, 398 S.C. 434, 442, 730 S.E.2d 305, 309 (S.C. 2012) (citing Goodwin v. Kennedy, 347 S.C. 30, 36, 552 S.E.2d 319, 322-23 (S.C. Ct. App. 2001)).

department and all that I have submitted for review formally and emails. I will not endure the psychological stress that I have endured supervising her this past year.

Compl. ¶ 106; Onley-Livingston Email dated 8/18/21 (ECF No. 47-15).

"A communication made in good faith on any subject matter in which the person communicating has an interest or duty is qualifiedly privileged if made to a person with a corresponding interest or duty even though it contains matter which, without this privilege, would be actionable." Murray v. Holnam, Inc., 344 S.C. 129, 140-41, 542 S.E.2d 743, 749 (S.C. App. 2001). "Communications between officers and employees of a corporation are qualifiedly privileged if made in good faith in the usual course of business. Conwell v. Spur Oil Co., 240 S.C. 170, 125 S.E.2d 270 (1962). The August 18th email was limited to the three parties involved, all in a supervisory chain of command. There is no evidence that the letter was disseminated beyond Plaintiff and Paquette or that it was sent by Onley-Livingston in anything other than the usual course of business. Thus, Plaintiff's slander claim fails as to this communication.

Plaintiff also argues that Onley-Livingston made slanderous Facebook posts regarding her work environment, including a Facebook live video on August 11, 2020, in which she references evil, that she is in the enemy's camp, and those enemies are attempting to do harm to her. Recording 2, No. 10. On August 14, 2020, Angel Onley Livingston made another post to Facebook, saying "the hole you dug for me is going to be the hole right next to yours-Me." Facebook Post (ECF No. 62-3 p. 19). Both the video and the post are rather vague as to whether she is speaking about any specific individual or circumstance and neither makes any reference to Plaintiff or any other indication that would lead anyone to believe the posts were about her. Further, Plaintiff fails to present any other evidence that ties these Facebook posts to her. Therefore, Plaintiff's slander claim fails as to these communications as well, and summary judgment is appropriate.

35

## V.      CONCLUSION

For the reasons discussed above, it is recommended that Defendants' Motion for Summary Judgment (ECF No. 47) be granted in part and denied in part.  Specifically, it is recommended that the motion be granted as to Plaintiff's causes of action hostile work environment and slander and that it be denied as to Plaintiff's cause of action for discrimination with respect to the disparate pay and her cause of action for retaliation.  Because the only cause of action alleged against Defendant Onley-Livingston is the slander cause of action, it is recommended that she be dismissed from this case entirely.

 s/Thomas E. Rogers, III
Thomas E. Rogers, III
United States Magistrate Judge

January 17, 2025
Florence, South Carolina