IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| Erika Pomerantz, | ) | C/A NO. 4:22-cv-01437-JD |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **ORDER AND OPINION** |
| | ) | |
| Coastal Carolina University, Peter | ) | |
| Paquette, Angel Onley-Livingston, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This matter is before the Court with the Report and Recommendation ("Report and Recommendation" or "Report") of United States Magistrate Judge Thomas E. Rogers, III, made in accordance with 28 U.S.C. § 636(b)(1) and Local Civil Rule 73.02(B)(2) of the District of South Carolina concerning Defendants' Motion for Summary Judgment.[1] (DE 47.)

## A.    BACKGROUND

The Report sets forth the relevant facts and legal standards, which the Court incorporates without a complete recitation. In any event, the Court provides this summary as a brief background.

Plaintiff Erika Pomerantz ("Plaintiff" or "Pomerantz") sued Coastal Carolina University ("CCU" or "University"), Peter Paquette ("Paquette"), and Angel Onley-

---

[1]    The recommendation has no presumptive weight, and the responsibility for making a final determination remains with the United States District Court. *See Mathews v. Weber*, 423 U.S. 261, 270-71 (1976). The court is charged with making a de novo determination of those portions of the Report and Recommendation to which specific objection is made. The court may accept, reject, or modify, in whole or in part, the recommendation made by the magistrate judge or recommit the matter with instructions. 28 U.S.C. § 636(b)(1).

Livingston ("Onley-Livingston") alleging causes of action for Race Discrimination, Retaliation, and Hostile Work Environment in violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000(e), et seq., and 42 U.S.C. § 1981, as well as state law causes of action for Slander and Negligent Supervision.[2] (DE 1-1.)

Plaintiff is a graduate of CCU.[3] She worked at CCU as a clinical counselor on a ten-and-a-half-month schedule with six weeks off during the summer. (DE 47-19 at 5, Pl. Dep. at 21.) She also saw clients on evenings, weekends, and during the summer outside her position with the University. (*Id.* at 5, Pl. Dep. 23, 27-29.)

Plaintiff represents that she is of Jamaican, Chinese, and Spanish descent, and that her mother is a first-generation immigrant to the United States, having earned her citizenship in 1997. Plaintiff's father is Jewish, and she celebrates Jewish holidays with him, but she is confirmed in the Catholic faith. (*Id.* at 22, Pl. Dep. 150.)

The Counseling Services department at the University provides counseling to students, including fifteen-minute consultations and thirty to forty-five-minute therapy sessions. (DE 62-11 at 6, Dep. 21.) Counseling Services has seven counselors when fully staffed, and each counselor sees about five to seven students daily. (DE 62-11 at 6, Dep. 21.)

---

[2]     The court previously dismissed a negligent supervision claim against the University and a slander claim against Paquette. (DE 13.) Because the only claim asserted against Paquette was the slander claim, he has been dismissed from this action.

[3]     Plaintiff worked as a math tutor while she was a student. (DE 47-19, Pl. Dep. at 8-10.) After graduation, Plaintiff worked as an Admissions Counselor and later in the Alumni Relations Office for CCU. (DE 47-19, Pl. Dep. at 13-14.) Plaintiff earned her Master's Degree in professional counseling while working at CCU. (DE 47-19, Pl. Dep. at 15.) Upon receiving her Master's Degree, Plaintiff worked for a private sector counseling office for about two years before returning to the University as a clinical counselor. (DE 47-19, Pl. Dep. at 21-24.)

At the time of Plaintiff's hiring, the Senior Director of Counseling Services was Dr. Jennie Cassidy ("Cassidy"). Plaintiff testified that in the Fall of 2018, Dr. Cassidy promised her a promotion by adding a public relations component to her responsibilities. According to Plaintiff, Dr. Cassidy said that she would have to convince her supervisor, Dr. Debbie Conner, the Vice-President of the Department, to create and budget for the position. (DE 47-19 at 8, Pl. Dep. 42-44.) Plaintiff testified that Dr. Cassidy adjusted her title to Clinical Counselor and Outreach Coordinator but informed her that it would not be until the Fall of 2019 before her salary would be adjusted. (DE 47-19 at 8, Pl. Dep. 43.) Dr. Cassidy also gave Plaintiff her office, and she relocated to a conference room. (DE 47-19 at 8, Pl. Dep. 44.)

CCU's Counseling Services office had gone through an accreditation with the International Accreditation of Counseling Services (IACS), which did not give the office full accreditation, noting that the office diversity did not meet the demographics of the campus as a whole. (DE 47-19 at 12, Pl. Dep. 57-58.) In the Spring of 2019, CCU had no African-American counselors in the office, as the only African-American counselor on staff had left. (DE 47-19 at 12, Pl. Dep. 58.) During that same period, the University undertook an "all campus climate survey" developed by the Office of Diversity and Inclusion. (DE 47-2.) The Counseling Services office planned to hire "a multicultural person or a person of color because [the] office did not reflect the statistics of the university as far as diversity." (DE 47-19 at 12, Pl. Dep. 56-57.) Plaintiff testified that Dr. Cassidy told the current counselors that it was the same position in the same pay band as theirs even though the title of the position was

different. (DE 47-19 at 12, Pl. Dep. 59-60.) Dr. Cassidy offered the position to Plaintiff before it was posted but stated that she would not receive a pay raise or a promotion despite having been promised one previously. (DE 62-1, ¶ 8.) Plaintiff declined because it was a twelve-month position, and Plaintiff wanted to remain on her ten-and-a-half-month schedule. (DE 47-17 at 12, Pl. Dep. 60.)

Ultimately, Sitonja Valenzuela, an African American female, was hired for the position. (DE 47-3.) Plaintiff looked up Valenzuela's salary on the state's salary website and noted that Valenzuela was paid more than the other counselors in the office. (DE 47-19 at 13, Pl. Dep. 65.) Plaintiff testified that she met with Dr. Cassidy in April 2019, and asked her for an explanation and was told "she's multicultural, so we paid her more money to get her." (DE 47-19 at 13, Pl. Dep. 65.) Plaintiff replied,

> I'm multicultural. What does that mean? And she (Cassidy) said, well, you present white. And I said, you can't say that. And that's race discrimination.

(DE 47-19 at 13, Pl. Dep. 66.) Plaintiff then had two or three more meetings with Dr. Cassidy, where she complained about Valenzuela's salary and the lack of progress in securing a higher salary for herself as discussed in the Fall of 2018. (DE 47-19 at 14, Pl. Dep. 71-72.) Dr. Cassidy told Plaintiff that Dr. Conner was looking into it and looking at compression/salary reviews in general. (DE 47-3 at 1.)

When Plaintiff returned from the summer break in August, she took her concerns to Kim Sherfesee ("Sherfesee"), the University's EEO Officer. (DE 47-19 at 14, Pl. Dep. 72; DE 62-2 at 74-77.) During her meeting with Sherfesee, Plaintiff explained that she thought it was unfair that someone was hired based on race and that she was discriminated against based on race and paid less than a less qualified

new hire. (DE 47-19 at 15, Pl. Dep. 73.) She also told Sherfesee that Dr. Cassidy told her she "presented white" and was not "multicultural enough." (DE 47-19 at 15, Pl. Dep. 73-74.) Plaintiff testified that the outcome she sought from her meeting with Sherfesee was to be paid equal to or more than Valenzuela because she was multicultural, too. (DE 47-19 at 15, Pl. Dep. 74.) Plaintiff expressed to Sherfesee that she did not want to "ruffle any feathers," and Sherfesee forwarded Plaintiff a copy of the University's retaliation policy. (DE 47-17 at 2 Dep. 40.)

Plaintiff also told Sherfesee that she spoke with Valenzuela, who said the job offer originally came with a lower salary, but Valenzuela rejected it and was ultimately given more money. (DE 47-3 at 1.) Plaintiff stated that she also requested a higher salary when she returned to the University for employment because the salary was lower than what she was making then, but her request was rejected. (*Id.*) Plaintiff informed Sherfesee that she was a Licensed Professional Counselor (LPC) and a Licensed Addictions Counselor in South Carolina, while Valenzuela was not currently certified in South Carolina. (*Id.* at 2; DE 62-2 at 63-67.)

On August 23, 2019, Sherfesee and Beverly Landrum ("Landrum"), the Vice-President for Human Resources, met with Dr. Conner and Paquette to discuss Plaintiff's concerns. (DE 47-3 at 3.) The group discussed that during the recent accreditation review by the IACS, the IACS noted that salaries in the Counseling Office were not at industry level. (*Id.* at 3.) Dr. Conner agreed to review the salary

issue with Frost[4] in consideration of the budget and consider equity increases. (DE 47-3 at 3.)

On September 13, 2019, Sherfesee and Landrum met with Cassidy to discuss Plaintiff and the other counselors. (DE 47-3 at 3.) Cassidy noted that Plaintiff and the other counselors expressed discontent following the posting of Valenzuela's salary on the state website. (*Id.*) Cassidy said that there had been discussions regarding the shortage of people of color, and when Dr. Conner approached the provost for a higher salary, diversity was a factor used to promote an increase in salary. (*Id.*) She noted that the Counseling Department needed a person of color because diversity is in the strategic plan and accreditors ask what is being done to promote diversity. (*Id.*) The group discussed focusing salary actions on what the market commands to attract all candidates (inclusive of diversity) and agreed to research professional salary data, including salaries at other universities. (DE 47-3 at 4.)

In her EEO Report dated October 7, 2019, after discussing the meetings held as a result of Plaintiff's complaint, Sherfesee noted the four specific concerns raised by Plaintiff: (1) Valenzuela negotiated her salary; (2) Plaintiff wanted a higher salary but could not negotiate; (3) Plaintiff believes she is more qualified than the new hire who received a higher salary; and (4) Plaintiff does not believe that her salary is equitable in comparison to the recent hire. (DE 47-3 at 4.) Sherfesee stated:

> [A]s a result of this complaint, Sherfesee assessed the salaries of all existing counselors and counseling services. All counselors, regardless of race, color, or ethnicity with the exception of the recent hire, are

---

[4]     Frost's role is unclear from the record.

6

experiencing salary compression. This is attributable to the lack of pay
increases within the public sector and market demands.

(*Id.*) In her findings, Sherfesee noted that there was evidence of salary compression
not tied to a specific race, color, or ethnicity. Sherfesee found that "[i]t did not appear
to Sherfesee or Landrum that there was any sort of deliberate act of discrimination
by Cassidy towards [Plaintiff] based on race or color." (*Id.* at 5.)

The recommendations included in the EEO Report were to address salary
compression for all counselors in the Counseling Services Department to remedy the
current compression issue, "[i]nitiate dialogue with the Diversity, Equity, and
Inclusion, human resources and other campus partners on best practices related to
promoting diversity in recruitment while assuring equity, fairness, and proper
communication," consider diversity and inclusion training for all departmental
employees, and counsel Cassidy on limiting conversation with employees in the
department regarding the salaries of others. (*Id.* at 5.)

On October 8, 2019, Sherfesee met with Plaintiff to inform her that a plan to
address her concerns had been forwarded for administrative review and approval,
and also sent her a letter dated October 11, 2019, in which Plaintiff was told she
would be receiving a raise. (DE 47-4.) In her deposition, Plaintiff agreed that the raise
was "very close" to Valenzuela's but "a little bit less." (DE 47-19 at 16, Pl. Dep. 87-
88.)

During the investigation into Plaintiff's complaint, on September 27, 2019, an
employee requested a meeting with Meredith Canady ("Canady"), Deputy
Compliance Officer, and alleged that Plaintiff made derogatory comments about a

7

coworker's sexual orientation. (DE 47-5 at 2; DE 47-6.) Plaintiff was notified of the allegations in a letter dated October 3, 2019, and informed that an investigation would take place. (DE 47-6.) On October 4, an attorney retained by Plaintiff, Peter Kaufman ("Kaufman"), sent a letter expressing his concerns about the October 3, 2019, letter and emphasized that Plaintiff was the victim of discrimination. (DE 62-9.) He expressed that the investigation into Plaintiff was in retaliation for her complaints of discrimination. (*Id.*) Kaufman sent another letter on October 14, 2019, reiterating Plaintiff's complaints of discrimination. (DE 62-9 at 2.) After interviewing the Complainant, Plaintiff, and Plaintiff's coworkers, the Compliance Office concluded in a report dated October 29, 2019, that there was insufficient evidence to support a finding that Plaintiff violated University policies UNIV-466 Title IX Statement of Non-Discrimination or Univ-468, Sexual Misconduct Policy.

After that, Dr. Paquette and Dr. Conner met with Plaintiff on November 14, 2019, regarding concerns of "bullying," "failure to maintain harmonious working relationships and violation of the code of ethical conduct (respect)," "potential breach of confidentiality," and "potential of inappropriate client referrals." (DE 47-7.) Dr. Paquette and Interim Director of Counseling Services, Lee Carter ("Carter"), met with Plaintiff again on December 5, 2019, and issued her a Notice of Written Reprimand, which noted that "[t]his written reprimand is intended to impress upon you the seriousness of your actions and is considered reasonable, equitable and warranted. In the future, it is expected that you will comply with directives. Failure

to do so may result in further disciplinary action, up to, and including termination." (*Id.*)

On October 21, 2019, after Plaintiff's initial meeting with Canady about the complaint made against her, Lori Cox met with Plaintiff to find out if she had any concerns about office dynamics. Plaintiff discussed her complaints with another counselor, Elisa Sperduto ("Sperduto"), whom she described as not a team player. She also mentioned that she believed Sperduto was the one that made the unfounded complaint that Plaintiff had made derogatory statements about another employee's sexual orientation. She noted that Sperduto had a problem with her that began before Plaintiff was employed with Counseling Services. Plaintiff did not make any complaints about discrimination or retaliation during this meeting.

Plaintiff met with Carter on December 2, 2019, and informed her that her complaints of discrimination had not been addressed and were not being investigated. Later in December, Plaintiff commented to Carter that there were Christmas decorations in the office but no Hanukkah decorations. (DE 47-19 at 21, Pl. Dep. 148-49.) Carter suggested that Plaintiff could buy Hanukkah decorations and put them up. (DE 47-19 at 21, Pl. Dep. 149.) Plaintiff did not know who purchased the Christmas decorations and did not complain to anyone else about them. (*Id.*) During her deposition, Plaintiff acknowledged that the decorations at issue—stockings, a Christmas tree, and presents—were not religious symbols. (DE 47-19 at 23, Pl. Dep. 153; DE 47-8.)

9

In the Spring of 2020, Onley-Livingston was hired to replace Dr. Cassidy as the Senior Director of Counseling Services. (DE 47-19 at 9, Pl. Dep. 48.) Plaintiff and the other counselors sat in on the interview process for Onley-Livingston and two other applicants and reviewed their resumes and provided their input about the applicants. (DE 47-19 at 9, Pl. Dep. 48-49.) Plaintiff believed Onley-Livingston had the least relevant experience. (DE 47-19 at 9, Pl. Dep. 48.) Dr. Paquette emailed Plaintiff on April 24, 2020, notifying her that Onley-Livingston would be moving into her office and noted that her new office would have a window and was similar in size to her current office. (DE 47-9.) He also asked that she pack up her office so that the Facilities team could move it. He noted that Onley-Livingston's start date was May 18, 2020.

Prior to Plaintiff's summer leave, she had a virtual meeting with Onley-Livingston, in which she informed Plaintiff that she would be making changes to various policies and procedures, including scheduling sessions with students for thirty minutes rather than an hour at the University's direction to see more students and eliminate the wait list. (DE 47-19 at 11, Pl. Dep. 54-55.) Plaintiff described that Dr. Cassidy had been flexible and accommodating while Onley-Livingston was more regimented and detailed. (DE 47-19 at 17, Pl. Dep. 91-92.) Plaintiff later complained to Dr. Paquette that the schedule was confusing and changed every day, but he told her that he did not get involved in scheduling matters. (DE 47-19 at 18, Pl. Dep. 96.)

Plaintiff testified that other counselors within the department found Onley-Livingston's management style to be confusing and left the department, including

Sean Pierce, Susan McLean, Megan Rodriguez, and Tena Nardin ("Nardin"). (DE 47-19 at 19 Pl. Dep. 106-08.) Nardin testified about the confusing work environment created by Onley-Livingston:

> What would happen is there would be several emails sent to myself about a request. And in the end - - at first, it was denial - - a denial. And then, in the end, it would be an approval via emails. It would be one thing in the email saying 'no'. And then, through a string of emails, miscommunication, convoluted emails, confusing emails back and forth from myself to Angel, in the end she would just approve it.
>
> . . .
>
> She seemed to be argumentative and wouldn't allow autonomy as far as us clinicians were concerned. So if we had any questions, she, like I said earlier, didn't want to answer them, those questions, and always seemed to want to argue about any of the questions that were presented to her, which were always professional.
>
> . . .
>
> So things weren't in place where she thought that they were. So it was just a really confusing work environment. So Erika would try to do one thing and Angel would say, well, you can't do this; this is in the policy. And it wasn't in the policy because the policy changed once a month. We got updates to the policies and the procedures internally once a month, and we didn't know what was in the policy and what was be like it's - - it's not in the policy or it's in the policy, so. It's - - it was just very - - just a really confusing work environment.
>
> . . .
>
> It was just a - - a constant battle for things like that to happen when all these forms were involved. Like we had to do form after form after form. Use a form for sick time, use a form for flex time, use a form for, you know, on-call. Every time we wanted to request everything. And so it just – it was just overwhelming, to say the least - - and, like I said, confusing, to say the least.

(DE 47-18 at 2, Dep. 10, 12, 14.) Nardin testified that Onley-Livingston's demands applied to all employees. (DE 47-18, at 2 Dep. 9.)

Onley-Livingston acknowledged that she received several verbal complaints from Plaintiff regarding a hostile work environment, and she took the complaints to

Dr. Paquette and Lori Cox in the Human Resources Office. (DE 47-16 at 2.) However, she testified she was unaware of any complaints from Plaintiff regarding her pay or that she was being treated differently because of her race. (*Id.*) Plaintiff testified that she told Onley-Livingston that she was involved in a case based on discrimination but did not provide further details. (DE 47-19 at 20, Pl. Dep. 114.)

Plaintiff filed her first Charge of Discrimination on June 10, 2020, with the South Carolina Human Affairs Commission (SCHAC). She alleged discrimination based on race, color, sex, religion, national origin, and retaliation with respect to Valenzuela's hire. She also alleges that the investigation into her remarks about sexual orientation and the December 5, 2019, written reprimand were attributable to her color, race, religion, sex, national origin, and in retaliation for filing a complaint of discrimination. (DE 47-10.)

On September 23, 2020, Plaintiff filed a second Charge of Discrimination based on race, religion, national origin, retaliation, and hostile work environment. Besides repeating some allegations raised in the first Charge, Plaintiff also alleges that she has experienced additional retaliation since she filed her first Charge and has experienced a hostile work environment.

Plaintiff alleges that her employer continuously makes her do things other employees do not have to do, refuses to accommodate her requests for schedule changes, and interferes with her working relationships to make her position more difficult to perform. (DE 47-11.)

On October 8, 2020, Plaintiff got a second Notice of Written Reprimand during a meeting with Dr. Paquette and Onley-Livingston. (DE 47-12.) She was reprimanded for failure to maintain harmonious working relationships and violation of the code of ethical conduct (respect), working on personal jobs during work hours, and insubordination and failure to follow office protocol or procedures. In the reprimand, Dr. Paquette noted that Plaintiff had already been reprimanded for failure to maintain harmonious working relationships and cited several concerns, including the demeaning tone and manner in which she addressed her colleagues and supervisors in group settings, inattentiveness/disinterest at staff meetings, disrespect towards a University Vice President outside the Counseling Services department, and addressing personal concerns during a staff meeting. (*Id.*) With respect to working on personal jobs, Plaintiff received a fax at the Counseling Services office from one of her private clients. (*Id.*) As for insubordination, Plaintiff was cited for failing to make appropriate requests for time off and refusing to use a new consultation form required by her supervisor. (*Id.*)

Following the meeting, Onley-Livingston agreed to Plaintiff's request for a personal day off and rescheduled her appointments for the day. (DE 47-13.) Dr. Paquette followed the meeting with an email to Plaintiff, noting that he was confident she and Onley-Livingston could openly discuss issues moving forward and that she understood expectations. He also invited Plaintiff to submit a rebuttal to the Second Written Reprimand, which she did. (DE 47-14.)

In her rebuttal, Plaintiff stated that another staff member was combative and aggressive towards her during a meeting on August 13, 2020. She also said that what may have appeared as inattentiveness or disinterest during staff meetings was only her taking notes on a laptop about the meeting. She would also stand or walk around during meetings at times but had never been told that this was a problem. Also, during a staff meeting on September 23, 2020, Plaintiff tried to clarify with Onley-Livingston what she and others found to be confusing, inconsistent, or inaccurate information and/or directions about scheduling and did not believe her questions were personal issues.

Plaintiff also explained in her rebuttal that she had not given a personal client her fax number at the University, and the individual must have found the information online. She also corrected the matter with the individual so that it would not happen again.

As for time off, Plaintiff stated that she requested time off for Labor Day weekend, and her request was denied while other counselors' requests were granted after hers. She also requested to switch lunches on September 25, 2020, with another counselor, Sean Pierce, and Onley-Livingston originally told Pierce he could not switch lunches with her, but the next day, the request was approved, but Onley-Livingston only notified Pierce of the approval and not Plaintiff.

Finally, as to the new consultation form, Plaintiff stated that she did not refuse to use the form as stated in the reprimand, but it was not saving correctly on her computer, and she brought that to Onley-Livingston's attention. She tried to comply

14

as much as possible with the required form by using the exact language from the consultation form in another document and by putting in a work request with IT.

## B.     REPORT AND RECOMMENDATION

On January 17, 2025, the Magistrate Judge issued the Report recommending that Defendants' Motion for Summary Judgment (DE 47) be granted in part and denied in part. (DE 69 at 36.) The Report recommends dismissing Plaintiff's hostile work environment and slander claims. (*Id.*) But the Report recommends denying summary judgment on Plaintiff's discrimination claim for disparate pay and her cause of action for retaliation. (*Id.*) Since the only cause of action alleged against Defendant Onley-Livingston is slander, the Report recommends that she be dismissed from this case. (*Id.*) As to Plaintiff's hostile work environment claim, the Report found that:

(1)     "Though Plaintiff frequently complained to Defendants about the hostile work environment she was enduring, she is not clear what actions occurred that created that hostile environment." (DE 69 at 31.)

(2)     "[T]hough Plaintiff frequently complained about her hostile working environment, the evidence in the record is insufficient to make a determination as to whether any alleged harassment was severe or pervasive." (*Id.* at 32.)

(3)     "There is no evidence in the record that the alleged harassment was motivated by actual animus towards Plaintiff's protected trait." (*Id.* at 33.)

As to Plaintiff's slander claim, the Report addressed Plaintiff's claim that Onley-Livingston intentionally placed Plaintiff in a false light and slandered her to

other employees when she emailed her and Paquette on August 18, 2021, among other things.[5] The Report found that:

> The August 18th email was limited to the three parties involved, all in a supervisory chain of command. There is no evidence that the letter was disseminated beyond Plaintiff and Paquette or that it was sent by Onley-Livingston in anything other than the usual course of business.

(DE 69 at 35.)

As to Plaintiff's Title VII Race Discrimination claim, the Report found that "Valenzuela, an African-American counselor['s]" salary was higher than Plaintiff's pay. (DE 69 at 18.) Dr. Cassidy stated, "she's multicultural, so we paid her more money to get her" along with a comment that Plaintiff was not multicultural enough and presented white. (*Id.*, *see also* DE 62-1 at 8.) Accordingly, the Report found that Plaintiff met her prima facie showing of discrimination on her salary. But the Report also found the CCU "presented a legitimate, nondiscriminatory reason for the difference in pay. . . ." (DE 69 at 22.) That said, the Report found that CCU gave Plaintiff two reasons why Valenzuela was paid more than her: (1) because Plaintiff was not multicultural enough, and (2) as a result of salary compression, which affected all previously hired counselors. (DE 69 at 23.) The Report found that a fact

---

[5]    The Report also considered Plaintiff's claims about a Facebook live video on August 11, 2020. The Report found that:

> Both the video and the post are rather vague as to whether she is speaking about any specific individual or circumstance and neither makes any reference to Plaintiff or any other indication that would lead anyone to believe the posts were about her. Further, Plaintiff fails to present any other evidence that ties these Facebook posts to her.

(DE 69 at 35.)

dispute exists since two reasons were given, making summary judgment inappropriate. (*Id.* at 24.)

As to Plaintiff's Retaliation claim, the Report found that Plaintiff has made a prima facie case for retaliation based on her reprimands after she complained about race and pay discrimination. The Report said referring to both reprimands Plaintiff received that,

> (1) On October 4, 2019, and October 14, 2019, counsel for Plaintiff sent letters to the University reiterating Plaintiff's claims of discrimination and that the recently opened investigation was retaliation for her discrimination complaints. Plaintiff was then issued her first written reprimand on December 5, 2019. Thus, Plaintiff suffered an adverse employment action approximately seven weeks after she engaged in protected activity.

(DE 69 at 28.)

> (2) [H]er second written reprimand occurred on October 8, 2020, a little over two weeks after Plaintiff filed her second Charge of Discrimination on September 23, 2020. There is sufficient temporal proximity to create a causal connection between these two events.

(*Id.* at 29.) The Report noted that the burden shifts to Defendants to produce a legitimate, non-retaliatory reason for the adverse actions. But Defendants only challenge whether Plaintiff can establish a prima facie case of retaliation. Defendants did not address a legitimate, nonretaliatory reason for the adverse action. And so, the Report recommended that summary judgment be denied. (DE 69 at 29.) Plaintiff and Defendants object to the Report. (DE 72, 73.)

## C.    LEGAL STANDARD

To be actionable, objections to the Report and Recommendation must be specific. Failure to file specific objections constitutes a waiver of a party's right to

further judicial review, including appellate review, if the recommendation is accepted by the district judge. *See United States v. Schronce*, 727 F.2d 91, 94 & n.4 (4th Cir. 1984). "The Supreme Court has expressly upheld the validity of such a waiver rule, explaining that 'the filing of objections to a magistrate's report enables the district judge to focus attention on those issues—factual and legal—that are at the heart of the parties' dispute.'" *Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 315 (2005) (citing *Thomas v. Arn*, 474 U.S. 140, 147 (1985) (emphasis added)). In the absence of specific objections to the Report and Recommendation of the magistrate judge, this Court is not required to give any explanation for adopting the recommendation. *See Camby v. Davis*, 718 F.2d 198, 199 (4th Cir. 1983).

### D.    OBJECTIONS

#### 1.  Plaintiff's Objections

Plaintiff objects to the Report's findings on her hostile work environment and slander claims, arguing that the Report overlooked facts supporting her claims. Turning first to the hostile work environment claim, the Report says, among other things, that Plaintiff's evidence is "insufficient to make a determination as to whether any alleged harassment was severe or pervasive." (DE 69 at 32.) To establish a hostile work environment claim, Plaintiff must show that she suffered from harassment that was (1) unwelcome, (2) based on a protected status, (3) sufficiently severe or pervasive to alter the conditions of her employment and create an abusive atmosphere, and (4) imputable to the employer. *EEOC v. C. Wholesalers, Inc.*, 573 F.3d 167, 175 (4th Cir. 2009); *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 373, 124 S.Ct. 1836, 158 L.Ed.2d 645 (2004) (recognizing that hostile work environment claims may be

brought under § 1981). "While the first element is subjective, the rest of the test is made up of objective components based on a 'reasonable person' standard." *Robinson v. Priority Auto. Huntersville, Inc.*, 70 F.4th 776, 781-82 (4th Cir. 2023).

Under the third element, harassment is severe or pervasive only if the workplace is "pervaded with discriminatory conduct aimed to humiliate, ridicule, or intimidate." *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 316 (4th Cir. 2008) (internal quotation marks omitted). Rude treatment, callous behavior, and a routine difference of opinion and personality conflict do not suffice to state a hostile work environment claim. *Id.* at 315–16. "[S]imple teasing, off-hand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal citations and quotation marks omitted). The Fourth Circuit has "recognized that plaintiffs must clear a high bar in order to satisfy the severe or pervasive test." *Sunbelt Rentals, Inc.*, 521 F.3d at 315.

Plaintiff's objection recites many facts about her attempts to notify CCU about her discrimination complaint, the retaliation she experienced, and how she felt. For example, Plaintiff points to two meetings in December 2019 to support her claim for a hostile work environment.[6] The first was about Christmas decorations around the office. Plaintiff says she pointed out that there was no other observance of any other religion, but she was told she could buy her own holiday decorations if she wanted

---

[6]     Plaintiff also refers to her interactions with Onley-Livingston to support her claim. But these personality conflicts and behavior, though purportedly rude, unfair, and callous, do not rise to the level of severe or pervasive conduct.

something different.  (DE 72 at 17.) Plaintiff also relies on a reprimand from Paquette to support her hostile work environment claim. Yet these examples fall short of the high bar needed to satisfy the severe or pervasive test.

As the Report adeptly concludes:

Plaintiff must point to 'instances where the environment was pervaded with discriminatory conduct aimed to humiliate, ridicule, or intimidate, thereby creating an abusive atmosphere.' There is no evidence in the record that the alleged harassment was motivated by actual animus towards Plaintiff's protected trait. Accordingly, summary judgment is appropriate on Plaintiff's hostile work environment claim.

(DE 69 at 33) (internal citation omitted). Accordingly, the Court overrules this objection.

As to Plaintiff's slander objection, Plaintiff argues that "Onley-Livingston made false statement[s] regarding Ms. Pomerantz performance[,] which is slander per se." (DE 72 at 29.) But this objection fails to address the Report's finding that:

'Communications between officers and employees of a corporation are qualifiedly privileged if made in good faith in the usual course of business.' *Conwell v. Spur Oil Co.*, 240 S.C. 170, 125 S.E.2d 270 (1962). The August 18th email was limited to the three parties involved, all in a supervisory chain of command. There is no evidence that the letter was disseminated beyond Plaintiff and Paquette or that it was sent by Onley-Livingston in anything other than the usual course of business.

(DE 69 at 35.) Accordingly, this objection is overruled.

## 2. Defendants Objections

Defendants make six objections to the Report. Objection 1 — Pay Disparity challenges whether Plaintiff established a prima facie case for discrimination. (DE 73 at 3.) Defendants maintain that the Report did "not properly analyze the fact that the Plaintiff was offered, and declined, the position in question prior to the position

20

being publicly posted." (DE 73 at 4.) But the Report did consider these facts along the other reasons for the pay disparity. The Report found that CCU gave Plaintiff different reasons why Valenzuela was paid more than she was. (DE 69 at 23.) The Report found that a fact dispute exists since two reasons were given, making summary judgment inappropriate. (*Id.* at 24.) This Court agrees and overrules the objection.

Defendants Objection 2 – Disparate Pay contests the Report finding "that the hiring of Ms. Valenzuela in and of itself [was] adverse to the Plaintiff or any of the other similarly situated counselors." (DE 73 at 4.) To begin with, the Report said:

> Disparate pay is an adverse employment action under Title VII. *Horton v. Walmart, Inc.*, No. 5:20-CV-00107, 2021 WL 3013365, at *4 (W.D. Va. July 16, 2021) (quoting *Bowen v. Manheim Remarketing, Inc.*, 882 F.3d 1358, 1364 (11th Cir. 2018)). Thus, Plaintiff has presented sufficient evidence to make a prima facie showing of discrimination with respect to her salary.

(DE 69 at 18-19.) The Report does not find that the hiring of Valenzuela is adverse to Plaintiff. Given that this objection does not address the substance of the Report's recommendation, it is overruled.

Defendants' Objection 3 – Retaliation argues that the Report erred when it recommended denying summary judgment because

> there is no evidence in the record that the two supervisors involved in Plaintiff's October 8, 2020 written reprimand had any knowledge of the Plaintiff's second charge of discrimination filed on September 23, 2020, thereby severing the causal relationship between the Plaintiff's protected activity and the Employer's action.

(DE 73 at 5.) Plaintiff's Retaliation claim asserts she made "complaints regarding race discrimination to management" (DE 1-1, ¶ 148), and she "has been treated

differently and subjected to retaliation by changing the terms and conditions of the Plaintiff's employment, disciplining the Plaintiff[]" (*id.* ¶ 149). A prima facie case of retaliation requires that: (1) the plaintiff engaged in protected activity; (2) her employer took an adverse action against her; and (3) a causal relationship existed between the plaintiff's protected activity and her employer's adverse action. *See Guessous v. Fairview Prop. Investments, LLC*, 828 F.3d 208, 217 (4th Cir. 2016). "[A] causal connection for purposes of demonstrating a prima facie case exists where the employer takes adverse employment action against an employee shortly after learning of the protected activity." *Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004), abrogated on other grounds by *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 253 (4th Cir. 2015).

Plaintiff offers no evidence to show that Paquette or Onley-Livingston knew that on September 23, 2020, Plaintiff filed a second Charge of Discrimination (DE 47-11) when they gave her the Second Notice of Written Reprimand (DE 47-12) on October 8, 2020. Accordingly, the Court agrees with Defendants' objection that Plaintiff has failed to meet her prima facie showing on the October 8, 2020, written reprimand.

As for Objection 4 – Retaliation, Defendants insist that "the Magistrate erred in finding that the Defendants failed to produce a legitimate, non-retaliatory reason for the adverse action." (DE 73 at 6.) To prevail under a *McDonnell Douglas* framework, a Plaintiff must first establish a prima facie case by showing:

> (i) "that [she] engaged in protected activity," (ii) "that [her employer] took adverse action against [her]," and (iii) "that a causal relationship

existed between the protected activity and the adverse employment activity."

*Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015) (internal citations omitted). The burden then shifts to Defendants to show that:

> its purportedly retaliatory action was in fact the result of a legitimate non-retaliatory reason. If the employer makes this showing, the burden shifts back to the plaintiff to rebut the employer's evidence by demonstrating that the employer's purported nonretaliatory reasons were not its true reasons, but were a pretext for discrimination.

*Foster v. Univ. of Maryland-E. Shore*, 787 F.3d at 250. Yet Defendants' motion only addresses the prima facie standard for retaliation with no analysis or discussion of its proof under the burden shifting standard. (DE 47-1 at 16.) To that end, Defendants arguments center on the lack of a "causal relationship" under the prima facie standard, not Defendants' legitimate non-retaliatory reason for its actions. For instance, Defendants claim:

> [o]n November 15, 2019, the Plaintiff was given a written reprimand due to concerns generated during the Human Resources investigation. During the time period between October 1 and November 15, 2019, Dr. Paquette began directly supervising Counseling Services and personally observed the Plaintiff's unprofessional behavior and negativity. His observations supported the Notice of Written Reprimand issued on December 5, 2019. All of these events occurred more than six (6) months prior to the University hiring Ms. Onley-Livingston as the Counseling Services Director.

(DE 47-1 at 16.) Although these statements suggest non-retaliatory reasons for Defendants' actions, Defendants conclude their defense on retaliation, saying:

> The Plaintiff cannot establish that the Defendant took any adverse employee action against her nor can she establish that a causal connection existed between any purported protected activity and any negative event she experienced. Based on the foregoing, the Plaintiff's retaliation claim should be dismissed.

(*Id.* at 17.) "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Report correctly found that "Defendants argue only that Plaintiff cannot establish a prima facie case of retaliation and do not address a legitimate, nonretaliatory reason for the adverse action. Therefore, summary judgment should be denied on Plaintiff's claim of retaliation." (DE 69 at 29.) This Court agrees and overrules Defendants' objection.

Defendants' Objection 5 – Retaliation maintains that "[t]he Magistrate erred in finding that the Plaintiff established a prima facie case of retaliation with regards to her first written reprimand." (DE 73 at 8.) Yet Defendants do not say which element of the prima facie test has not been met. *See Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015) ((i) "that [she] engaged in protected activity," (ii) "that [her employer] took adverse action against [her]," and (iii) "that a causal relationship existed between the protected activity and the adverse employment activity.") (internal citations omitted). Instead, Defendants insist that "[w]hat the Magistrate fails to consider is the University's obligation to undertake an investigation upon the lodging of a Title IX complaint." (DE 73 at 8.)

As stated above, this defense goes to Defendants' proof under the burden shifting framework to show "its purportedly retaliatory action was in fact the result of a legitimate non-retaliatory reason." *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d at 250. The Report found that Plaintiff's attorney sent a letter to CCU asserting claims of discrimination, and within seven weeks of that letter, Plaintiff received her

first written reprimand. Defendants fail to show why Plaintiff has not met her prima facie burden. Defendants' objection is, therefore. overruled.

Lastly, as to Objection 6 – Pretext, Defendants contend that "[t]he Magistrate erred in determining that the record provides sufficient pretext for denying Defendants' Motion for Summary Judgment." Under the *McDonnel Douglas* framework, if an employer shows the retaliatory action resulted from a legitimate non-retaliatory reason, "the burden shifts back to the plaintiff to rebut the employer's evidence by demonstrating that the employer's purported nonretaliatory reasons 'were not its true reasons, but were a pretext for discrimination." *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d at 250. "[T]o show pretext, a plaintiff may show that an employer's proffered nondiscriminatory reasons for the termination are inconsistent over time, false, or based on mistakes of fact." *Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 652 (4th Cir. 2021); *see also E.E.O.C. v. Sears Roebuck & Co.*, 243 F.3d 846, 853 (4th Cir. 2001) ("An employer's changing rationale for making an adverse employment decision can be evidence of pretext.")

The Report found that CCU gave Plaintiff two reasons why Valenzuela was paid more than her: (1) because Plaintiff was not multicultural enough, and (2) as a result of salary compression, which affected all previously hired counselors. (DE 69 at 23.) The Report found that a fact dispute exists since two reasons were given, making summary judgment inappropriate. (DE 69 at 24.) Since a reasonable juror could infer that the shifting and inconsistent explanations given by the CCU at trial

were pretextual, summary judgment is inappropriate. Thus, Defendants' objection is overruled.

### E.     CONCLUSION

Accordingly, after a thorough review of the Report and Recommendation and the record, the Court adopts the Report (DE 69) and incorporates it here by reference as modified here.

It is therefore **ORDERED** that Summary Judgment (DE 47) is **Granted** for Defendants as to Plaintiff's causes of action for Hostile Work Environment and on Plaintiff's Retaliation claim related to the October 8, 2020, written reprimand.

It is **FURTHER ORDERED** that Summary Judgment (DE 47) is **Granted** for Defendant Onley-Livingston on Plaintiff's Slander claim.

It is **FURTHER ORDERED** that Summary Judgment (DE 47) is **Denied** as to Plaintiff's cause of action for Discrimination with respect to Disparate Pay and Plaintiff's Retaliation claim related to the December 5, 2019, written reprimand.

**IT IS SO ORDERED**.

Joseph Dawson, III
United States District Judge

Florence, South Carolina
March 31, 2025

## NOTICE OF RIGHT TO APPEAL

The parties are hereby notified of the right to appeal this order within thirty (30) days from this date under Rules 3 and 4 of the Federal Rules of Appellate Procedure.